IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ILLINOIS NATIONAL INSURANCE COMPANY, an Illinois corporation; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., a Pennsylvania corporation, | ) ) ) ) ) ) | CIVIL. NO. 11-00515 SOM/KSC ORDER GRANTING COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS COUNTERCLAIM PLAINTIFF'S FIRST AMENDED COUNTERCLAIM |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| NORDIC PCL CONSTRUCTION, INC., f/k/a NORDIC CONSTRUCTION, LTD., a Hawaii corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

**ORDER GRANTING COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS COUNTERCLAIM PLAINTIFF'S FIRST AMENDED COUNTERCLAIM**

I.      INTRODUCTION.

        This is an insurance dispute arising out of alleged construction defects.  Plaintiffs Illinois National Insurance Company ("Illinois National") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") (collectively, the "Insurers"), seek declaratory relief against Defendant Nordic PCL Construction, Inc., f/k/a Nordic Construction, Ltd. ("Nordic"). Compl., ECF No. 1.  Nordic filed a Counterclaim against the Insurers, and a Third-Party Complaint against Marsh USA ("Marsh"), which allegedly acted as Nordic's insurance broker. Countercl., ECF No. 10-1; Third-Party Compl., ECF No. 11.  This

court earlier granted in part the Insurers' motion to dismiss the Counterclaim, but gave Nordic leave to amend its Counterclaim in certain respects. <u>See</u> Order ("Prior Dismissal Order"), ECF No. 69. Nordic filed a First Amended Counterclaim, ECF No. 84, and now before the court is the Insurers' Motion to Dismiss Nordic's First Amended Counterclaim. ECF No. 88. The court grants the Insurers' motion, and extends the deadline for motions seeking leave to amend pleadings.

II.      **BACKGROUND.**

Nordic acted as a general contractor on two projects (a Safeway store and the Moanalua Shopping Center) for which it seeks insurance coverage in connection with alleged construction defects. Nordic is a defendant in a pending state court action on the Safeway project, and has spent over $460,000 in repairs on the Moanalua project. Am. Countercl. ¶¶ 28, 44, ECF No. 84. Nordic tendered its defense of the pending state court action to the Insurers and sought reimbursement from the Insureds for the repairs it had performed. The Insurers filed this action to determine their obligations to Nordic under their policies. <u>See</u> Compl., ECF No. 1.

The facts relevant to this motion include the facts set forth in detail in this court's lengthy Prior Dismissal Order. <u>See</u> ECF No. 69. Those facts are incorporated here and supplemented.

In or around 2007, Illinois National issued Commercial General Liability Policy No. GL 161-68-33 (the "CGL Policy") to Nordic.  <u>See</u> CGL Policy, attached as Exhibit "A" to Compl., ECF No. 1-1.  In or around 2007, National Union issued Commercial Umbrella Liability Policy No. BE 5685754 (the "Umbrella Policy") to Nordic.  <u>See</u> Umbrella Policy, attached as Exhibit "B" to Compl., ECF No. 1-2.

The CGL Policy provides, "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury or 'property damage' to which this insurance applies."  CGL Policy at 23 of 64 (page numbers refer to numbers at top of page in electronically filed document).  The Umbrella Policy likewise states, "We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by laws because of **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury or Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract**."  Umbrella Policy at 6 of 63 (emphasis in original).

The CGL Policy's coverage "applies to 'bodily injury' and 'property damage' only if . . . [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place

in the 'coverage territory.'" CGL Policy at 23 of 64.  The Umbrella Policy only applies if "the **Bodily Injury** or **Property Damage** is caused by an **Occurrence** that takes place anywhere, and the **Bodily Injury** or **Property Damage** occurs during the **Policy Period**."  Umbrella Policy at 6 of 63.

Under the CGL Policy, "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  CGL Policy at 35 of 64.  "In the event of continuing or progressive 'bodily injury' or 'property damage' over any length of time, such 'bodily injury' or 'property damage' shall be deemed to be one 'occurrence', and shall be deemed to occur only when such 'bodily injury' or 'property damage' first commenced."  Id. at 13 of 64.  The Umbrella Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **Occurrence**."  Umbrella Policy at 25 of 63.

The First Amended Counterclaim asserts that, notwithstanding the Prior Dismissal Order, Nordic is entitled to coverage pursuant to provisions relating to what the CGL Policy and Umbrella Policy refer to as the "products-completed operations hazard" ("PCOH").  Because PCOH provisions were not clearly identified in the original Counterclaim, the Prior

4

Dismissal Order did not include a ruling on what, if any, coverage was available through them.

Nordic's original Counterclaim asserted (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) misrepresentations and omissions of material fact, and (4) bad faith, and sought (5) declaratory relief.  See Countercl., ECF No. 10-1.

This court dismissed most of the Counterclaim.  The heart of the dismissal was this court's conclusion that "the alleged construction defects are not 'occurrences' as defined by the Intermediate Court of Appeals ('ICA') in Group Builders, Inc. v. Admiral Insurance Company, 123 Haw. 142, 231, 231 P.3d 67 (Ct. App. 2010) ('Group Builders'), and by the Ninth Circuit in Burlington Insurance Company v. Oceanic Design & Construction, Inc., 383 F.3d 940, 944 (9th Cir. 2004) ('Burlington')."  Prior Dismissal Order at 16.  The court's determination that there was no "occurrence" under the Policies meant that there was no triggering event that afforded Nordic coverage.  While the court denied Nordic leave to amend the "occurrence-based portion" of its breach of contract claim, the court allowed Nordic leave to amend its breach of contract claim in other respects.  Id. at 37.

The court also rejected Nordic's claim for breach of the covenant of good faith and fair dealing (Count II) because "Nordic fails to identify the specific contractual provisions

5

that the Insurers allegedly breached, and the court is unable to identify what obligations Count II is based on." Id. at 37. The court dismissed Nordic's claim for fraudulent and negligent misrepresentation and omissions of material facts (Count III) as inadequately pled. Id. at 42-43 (finding that the fraud portion of Count III failed to satisfy Rule 9(b)'s heightened pleading requirement, and that the negligent misrepresentation portion of Count III, subject only to Rule 8, was defective because it "allow[ed] Nordic to spring on the Insurers an unlimited number of unidentified misrepresentations"). The court concluded that Nordic had sufficiently pled bad faith (Count IV), to the extent the claim was not based on fraud, but that any fraud-based bad faith claim was insufficiently pled. Id. at 43-45.

The court denied Nordic and Marsh's motions for reconsideration. ECF No. 83. Nordic then filed its First Amended Counterclaim asserting: (1) Count I: Breach of Contract; (2) Count II: Negligent Misrepresentations and Omissions of Material Fact; (3) Count III: Bad faith and Fraud; and (4) Count IV: Declaratory Relief. ECF No. 84. The Insurers now seek dismissal of the First Amended Counterclaim. ECF No. 88. Nordic

is joined in its opposition to the Insurers' motion by Marsh.[1]
ECF No. 111.

The CGL Policy defines PCOH as including "all 'bodily
injury' and 'property damage' occurring away from premises you
own or rent and arising out of 'your product' or 'your work'
except" for products "still in your physical possession" or
"[w]ork that has not yet been completed or abandoned."  CGL
Policy at 35 of 64.  The CGL Policy further states, "Work that
may need service, maintenance, correction, repair or replacement,
but which is otherwise complete, will be treated as completed."
Id.  The Umbrella Policy says that PCOH "means all **Bodily Injury**
and **Property Damage** occurring away from premises you own or rent
and arising out of **Your Product** or **Your Work** except" for
"products that are still in your physical possession" or "work

_____

[1]The Insurers challenge Marsh's standing to oppose their
motion.  Marsh asserts that it has a right to participate in all
matters in this case.  This court permits Marsh to participate.
The court notes that, because the court grants the motion
notwithstanding Marsh's participation, any prejudice to the
Insurers is limited to the need to address arguments that Marsh
raised.  Given the stay of Nordic's claims against Marsh, the
court thinks it appropriate to give Marsh's future joinders
slightly different treatment from joinders in general.  To the
extent any future joinder by Marsh in a motion or opposition
filed by Nordic addresses only issues unique to Marsh, Marsh need
only comply with Local Rule 7.9 and other court rules.  However,
to the extent any future joinder by Marsh is filed to support
Nordic, even if victory by Nordic would benefit Marsh, Marsh's
joinder is limited in length to any balance below the maximum
word limit in Local Rule 7.5 left by Nordic's filing.

that has not yet been completed or abandoned." Umbrella Policy at 26 of 63.

The CGL Policy defines "Your work" to mean "[w]ork or operations performed by you or on your behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations." CGL Policy at 36 of 64. The Umbrella Policy defines "**Your Work**" as "work or operations performed by you or on your behalf" and "materials, parts or equipment furnished in connection with such work or operations." Umbrella Policy at 28 of 63.

There are two exclusions in the CGL Policy that address PCOH issues. First, Exclusion j excludes from coverage any "Property damage" to:

> (1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;
> (2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;
> (3) Property loaned to you;
> (4) Personal property in the care, custody or control of the insured;
> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
> (6) That particular part of any property that must be restored, repaired or replaced

8

because "your work" was incorrectly performed
on it.

CGL Policy at 26 of 64.  However, an exception to this exclusion
provides: "Paragraph (6) of this exclusion does not apply to
'property damage' included in the 'products-completed operations
hazard.'"  Id.  The Umbrella Policy has an equivalent provision
in Exclusion E(6).  Umbrella Policy at 11 of 63.

Second, Exclusion $\ell$ excludes from coverage "'Property
damage' to 'your work' arising out of it or any part of it and
included in the 'products completed operations hazard.'" CGL
Policy at 26 of 64.  However, there is also an exception to this
exclusion: "This exclusion does not apply if the damaged work or
the work out of which the damage arises was performed on your
behalf by a subcontractor."  CGL Policy at 26 of 64.  The
Umbrella Policy has an equivalent provision at Exclusion G.
Umbrella Policy at 11 of 63.

The court turns now to examining Nordic's amended
claims and the arguments relating to them.

III.      LEGAL STANDARD.

Under Rule 12(b)(6), a court is generally limited to
reviewing the contents of the complaint.  Sprewell v. Golden
State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Campanelli v.
Bockrath, 100 F.3d 1476, 1479 (9th Cir. 1996).  If matters
outside the pleadings are considered, the Rule 12(b)(6) motion is

treated as one for summary judgment.  <u>See</u> <u>Keams v. Tempe Tech.</u> <u>Inst., Inc.</u>, 110 F.3d 44, 46 (9th Cir. 1997); <u>Anderson v.</u> <u>Angelone</u>, 86 F.3d 932, 934 (9th Cir. 1996).  However, courts may "consider certain materials--documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice--without converting the motion to dismiss into a motion for summary judgment."  <u>United States v. Ritchie</u>, 342 F.3d 903, 908 (9th Cir. 2003).

On a Rule 12(b)(6) motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  <u>Fed'n of African Am.</u> <u>Contractors v. City of Oakland</u>, 96 F.3d 1204, 1207 (9th Cir. 1996).  However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss.  <u>Sprewell</u>, 266 F.3d at 988. Additionally, the court need not accept as true allegations that contradict matters properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint. <u>Id.</u>  Dismissal under Rule 12(b)(6) may be based on either: (1) lack of a cognizable legal theory, or (2) insufficient facts under a cognizable legal theory.  <u>Balistreri v. Pacifica Police</u> <u>Dept.</u>, 901 F.2d 696, 699 (9th Cir. 1988) (citing <u>Robertson v.</u>

<u>Dean Witter Reynolds, Inc.</u>, 749 F.2d 530, 533-34 (9th Cir. 1984)).

To survive a Rule 12(b)(6) motion to dismiss, a claimant must make factual allegations sufficient to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). <u>Accord</u> <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (internal citations omitted). The complaint must "state a claim to relief that is plausible on its face." <u>Id.</u> at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 129 S. Ct. at 1949.

As the Ninth Circuit has recently stated:

11

> First, to be entitled to the presumption of
> truth, allegations in a complaint or
> counterclaim may not simply recite the
> elements of a cause of action, but must
> contain sufficient allegations of underlying
> facts to give fair notice and to enable the
> opposing party to defend itself effectively.
> Second, the factual allegations that are
> taken as true must plausibly suggest an
> entitlement to relief, such that it is not
> unfair to require the opposing party to be
> subjected to the expense of discovery and
> continued litigation.

Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

IV.     ANALYSIS.

    A.    Count I (Breach of Contract) Is Dismissed.

    Count I is an attempt by Nordic to obtain coverage

under the PCOH provisions in the Policies.  The gist of Nordic's

argument is that the PCOH provisions are not subject to this

court's reading of the "occurrence" requirement.  The Insurers

move to dismiss Count I on the ground that the PCOH provisions

are indeed subject to the "occurrence" requirement and that

coverage therefore remains unavailable.  This court agrees.

    Nordic's amended breach of contract claim asserts that

the Insurers breached the Policies "by unreasonably refusing to

acknowledge and abide by [their PCOH coverage provisions] for

post-completion property damage claims arising out of

construction defects."  Am. Countercl. ¶¶ 76-77.  Nordic further

asserts, "If, as [the Insurers] now contend[], there is no PCOH coverage for post completion property damage claims arising out of construction defects . . . because such claims necessarily do not arise out of an 'occurrence,' then the PCOH coverage is illusory." Id. ¶ 78.  Therefore, Nordic says, the term "occurrence" must be construed as including defects in contractual performance.  In the alternative, Nordic contends that the Policies are ambiguous because "there is no language in the Policies that clearly states that post completion property damage claims arising out of construction defects, such as those alleged in the Safeway Claim and the Moanalua Claim, are not covered unless they arise out of an 'occurrence.'" Id. ¶ 80.

The parties do not dispute that the PCOH provisions take effect only if an insured pays additional premiums.  Nor do the parties dispute that Nordic paid those additional premiums. The court therefore proceeds with the premise that the effect of the PCOH provisions is indeed in issue.

### 1.    The Court's Analysis Begins With An Examination of What Is Covered.

The PCOH provisions include a definition of PCOH, see CGL Policy at 35 of 64, and exceptions to two exclusions, see id. at 26 of 64.  Nordic is correct in noting that none of these provisions states that any property damage for which coverage is

sought must have been caused by an "occurrence."  This, however,
is not a circumstance that ends up being helpful to Nordic.  None
of those provisions mentions coverage at all.  Therefore, if this
court confined its analysis to looking only at the PCOH
provisions, Nordic would surely be unable to establish any
coverage.  This court instead looks to the coverage provisions
outside of the PCOH provisions to determine what coverage may be
afforded by Nordic's payment of the additional PCOH premium.

  The only coverage provision that could possibly apply
to the Safeway and Moanalua disputes is Coverage A, which applies
to liability for bodily injury and property damage.  (Coverage B
covers personal and advertising injury liability, and Coverage C
covers medical payments.)  Coverage A begins with an "Insuring
Agreement" that states, "We will pay those sums that the insured
becomes legally obligated to pay as damages because of 'bodily
injury' or 'property damage' to which this insurance applies."
It then goes on to say that coverage applies only if "[t]he
'bodily injury' or 'property damage' is caused by an 'occurrence'
that takes place in the 'coverage territory.'" CGL Policy at 23
of 64.[2]  If the protection afforded by the PCOH provisions falls

  [2] As Marsh notes, Endorsement 69186 added language to the
definition of "occurrence."  The additional language refers to
"continuing or progressive" property damage, which is deemed "to
be one 'occurrence'" and which is deemed "to occur only when such
. . . 'property damage' first commenced."  CGL Policy at 13 of

under Coverage A, then that protection must be subject to the "occurrence" analysis that was this court's focus in its earlier order.

Nordic protests that such a conclusion would render meaningless the PCOH exceptions to exclusions.  Exclusion j(6) excludes from coverage under Coverage A property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  However, "this exclusion does not apply to 'property damage' included in the 'products-completed operations hazard.'"  Nordic says that the PCOH exception to Exclusion j(6) must be read to mean that, upon payment of PCOH premiums, an insured does indeed have coverage for property damage caused by Nordic's allegedly incorrect performance of its work.

Nordic makes a similar argument with respect to Exclusion $\ell$.  That exclusion says that Coverage A is not applicable to "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'"  There is an exception to this exclusion: "This exclusion does not apply if the damaged work or the work

---

64.  This additional language goes to determining the number and timing of occurrences when damage is continuing.  The additional language neither eliminates the requirement that the damage have been caused by an occurrence, nor rescinds the statement that an "occurrence" means an "accident."

out of which the damage arises was performed on your behalf by a subcontractor." Again, Nordic says that this exception, like the exception to Exclusion j(6), must be read as indicating that, under the PCOH provisions, property damage to its work is indeed covered.

In effect, Nordic is arguing that the PCOH exceptions to exclusions create coverage. Reading the Policies in such a way would require this court to rewrite the Policies.

It is a basic principle of policy construction that one starts by determining whether a claim falls within a coverage provision. The burden of proving the applicability of coverage falls on the insured. Sentinel Ins. Co., Ltd., v. First Ins. Co. Of Haw., Ltd., 76 Haw. 277, 292 n.13, 875 P.2d 894, 909 n.13 (1994). If there is no applicable coverage, one never reaches the exclusions, let alone exceptions to the exclusions.

This is the procedure outlined in Great Divide Insurance Co. v. Association of Apartment Owners of Maluna Kai Estates, 492 F. Supp. 2d 1216, 1227 (D. Haw. 2007). In that case, Judge Alan C. Kay, having conducted a bench trial, noted that the insured has the "initial burden of proving by a preponderance of the evidence that the . . . claim falls within the Policy." Id. Once the insured meets that burden, "the burden shifts to [the insurer] to prove facts that bring the

16

claim within the exclusionary clause of the Policy." Id. Once

the insurer satisfies that burden, "the burden shifts back to

[the insured] to prove that the exception to the . . . Exclusion

applies to restore coverage under the Policy." Id. Under this

procedure, this court would not reach the PCOH exceptions to

exclusions.

Using exactly the approach Judge Kay outlines, the Iowa

Supreme Court, in Pursell Construction, Inc. v. Hawkeye-Security

Insurance Co., 596 N.W.2d 67 (Iowa 1999), declined even to

address the PCOH provisions. Pursell involved a contractor that

sought coverage under a CGL policy for claims that, in 1995, it

had constructed houses in violation of the city's requirement

that the lowest level of a house be elevated above a floodplain.

The CGL policy included PCOH provisions. In concluding that

Pursell was not entitled to coverage, the court said:

> Before proceeding to our analysis of whether
> there was coverage, we think it would be
> helpful to explain how the PCOH provision
> fits into a CGL policy. A CGL policy, like
> every other policy, has an insuring clause
> under which the insurer agrees to pay sums
> that the insured becomes legally obligated to
> pay because of property damages caused by an
> occurrence. The CGL policy also has
> exclusions that take away some of this
> coverage. The PCOH provision is an exception
> to these exclusions. Or, stated in another
> way, the PCOH provision is simply a category
> of losses that are covered even though these
> losses might otherwise be excluded. Viewed

17

> in this light, the PCOH provision does not
> create a separate category of coverage.
> Rather, any loss falling within the PCOH
> provision must still meet all the
> requirements of the policy, like any other
> loss, except the exclusion from which the
> losses are excepted. *See generally 1 Eric
> Mills Holmes & Mark. S. Rhodes, Appleman on
> Insurance (Second)* § 4.20, at 473 (1996).

Id. at 69.  Concluding that there had not been an "occurrence"

triggering coverage, the court did not address any exclusion or

any PCOH exception to an exclusion.  Id. at 71.

The insurer that defeated Pursell's coverage claim had

equal success with the Missouri Court of Appeals.  In Hawkeye-

Security Insurance Co. v. Davis, 6 S.W.3d 419 (Mo. Ct. App.

1999), the court said:

> Here, Appellants urge us to analyze and find
> ambiguity in the policy because of exclusion
> 2(*l*), and, as a consequence, declare there is
> coverage for their loses.  They apparently
> would have us do this without first
> considering whether there was an insured
> event, i.e., an obligation of indemnity
> undertaken by the policy for this type
> problem.  The foregoing cases teach that such
> an analysis would be flawed.  We have already
> determined that the evidence before us does
> not satisfy Appellants' burden of showing an
> "occurrence" within the meaning of the
> policy; consequently, Hawkeye need not invoke
> the paragraph 2(*l*) exclusion to relieve
> itself of its insuring agreement.  Under the
> circumstances it is unnecessary to decide
> whether the exclusion in paragraph 2(*l*) is
> without ambiguity, or whether, as Appellants
> contend, the exclusion is ambiguous and is,
> therefore, subject to resolution in favor of

18

> coverage. . . . [A]ny discussion of this
> argument would be merely advisory.
> "Appellate courts do not render advisory
> opinions or decide nonexistent issues." . . .
> For this reason, we refrain from addressing
> this issue.

Id. at 427 (footnote and citations omitted).  See also Weedo v.

Stone-E-Brick, Inc., 405 A.2d 788, 795 (N.J. 1979)("exclusions

clauses Subtract from coverage rather than grant it").

Pursell and Davis are consistent with the case the

Insurers rely most heavily on, Kvaerner Metals Division v.

Commercial Union Insurance Co., 908 A.2d 888 (Pa. 2006).

Kvaerner involved a CGL policy with PCOH provisions.  Finding no

"accident" qualifying as an "occurrence" in the insured's

allegedly faulty workmanship, the Pennsylvania Supreme Court

said, "Given this conclusion, it is not necessary for us to

consider whether the business risk/work product exclusions also

preclude coverage here."  Id. at 900.  The Pennsylvania Supreme

Court thus said nothing about the Superior Court's determination

that there were questions of fact about the effect of those

exclusions created by an endorsement that "altered the exclusions

by permitting coverage for property damage caused by the

insured's subcontractor."  Id. at 995.

The procedure followed in the cases above is a logical

one.  Applied here, it ends this court's consideration as soon as

the court determines that the absence of an "occurrence" precludes coverage.

>    **2.    Construing The Policies In Their Entirely Does Not Require Ignoring The Plain Meaning of "Occurrence."**

This court, of course, recognizes that Hawaii insurance law is far more than a logical procedure to be followed.  As this court noted in the Prior Dismissal Order, under Hawaii law, general rules of contract construction apply to the interpretation of insurance policies.  Because insurance contracts are contracts of adhesion, any ambiguities must be resolved against the insurer.  Hawaii law also states: "Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, restricted, or modified by any rider, endorsement or application attached to and made a part of the policy."  See Haw. Rev. Stat. § 431:10-237.  See also Burlington, 383 F.3d at 945; Dairy Rd. Partners v. Island Ins. Co., Ltd., 92 Haw. 398, 411, 992 P.2d 93, 106 (2000).

In considering whether section 431:10-237 requires the court to take into account the PCOH exceptions to exclusions, the court has examined Hawaii decisions discussing section 431:10-237.  Particularly instructive is Smith v. New England Mutual Life Insurance Co., 72 Haw. 531, 827 P.2d 635 (1992).

20

Smith, decided 3-2, held that the survivor of an employee was not entitled to life insurance proceeds under a group life insurance policy issued to the employee's employer. The policy provided that "each employee" became eligible to be insured under the group policy upon completion of a waiting period.  The applicable waiting period provision referred to "Persons who become employees after the effective date of the Policy, upon completion of three months of continuous active service."  The word "employee" was defined as "[a]ny person employed and compensated for services by the Policyholder . . . on a regular full-time permanent basis."  The employee in question had first been a part-time employee and became a full-time employee less than three months before her suicide.  The majority decision held that the employee was not covered by the policy because she had not worked full-time for three months. Citing section 431:10-237, the court said, "[W]e find the waiting period exclusion, as written, to be clear and unambiguous because the term 'employee' as used therein must be read and construed according to its meaning as defined in the policy."  Id. at 534, 827 P.2d at 637.

Smith suggests that this court should not, as urged by Nordic, expand the definition of "occurrence" in the context of the PCOH provisions so that "occurrence" includes defective

performance of contractual obligations.  Instead, the reasoning of <u>Smith</u> indicates that section 431:10-237 requires that "occurrence" retain the same definition throughout the CGL Policy and Umbrella Policy.

The court notes that <u>Pursell</u>, <u>Davis</u>, and <u>Kvaerner</u>, which did not examine exclusions or PCOH exceptions to exclusions, were decided in jurisdictions that, like Hawaii, require consideration of the entirety of a policy.  <u>See</u> <u>Cairns v. Grinnell Mut. Reinsurance Co.</u>, 398 N.W.2d 821 825 (Iowa 1987) ("we adhere to the proposition that 'a contract should be read and interpreted as an entirety rather than seriatim by clauses'"); <u>Todd v. Mo. United Sch. Ins. Council</u>, 223 S.W.2d 156, 163 (Mo. 2007) ("Insurance policies are read as a whole, and the risk insured against is made up of both the general insuring agreement as well as the exclusions and definitions."); <u>Davis</u>, 6 S.W.3d at 424 (noting that, in Missouri, "when interpreting an insurance policy . . . we consider the entire policy and not isolated provisions or clauses"); <u>Riccio v. Am. Republic Ins. Co.</u>, 550 Pa. 254, 264, 705 A.2d 422, 426 (1997) ("an insurance policy, like every other written contract, must be read in its entirety and the intent of the policy is gathered from consideration of the entire instrument").

Like the courts in Iowa, Missouri, and Pennsylvania, this court does not apply the "construction according to the entirety" principle to raise the import of an exception to an exclusion over the import of a coverage provision.  That is what Nordic seeks to have this court do (i.e., alter the definition of "occurrence" in the coverage provision in aid of giving the exceptions to exclusions the meaning Nordic contends is appropriate).

Nordic alternatively argues that the court should "delink" PCOH coverage from any "occurrence" requirement.  But the "occurrence" requirement is part of the coverage provision. It is not clear what language in the CGL Policy Nordic could then rely on to define the scope of PCOH coverage.  If this case went to trial on the issue of what the PCOH coverage was, would Nordic present evidence of discussions that preceded the signing of the Policies as evidence of a coverage agreement?  Enforcing any purported coverage agreement that preceded the signing of the Policies would contradict the statement in the CGL Policy that "[t]his policy contains all the agreements between you and us concerning the insurance afforded."  CGL Policy at 22 of 64.  The court's concern is that construing a policy according to the entirety of its terms does not mean reading a term like "occurrence" out of a coverage provision.

### 3.    The PCOH Provisions Are Not Illusory.

Notwithstanding the problems that the court has

identified with Nordic's reading of the PCOH provisions, Nordic

is correct in saying that, having paid a PCOH premium (and a

substantial one at that), Nordic is certainly entitled to

something in return.  The court turns therefore to Nordic's

contention that, if the court refuses to read the exceptions to

exclusions as giving rise to coverage for the defective

performance of contractual obligations, the PCOH provisions

become illusory.

The Insurers take the position that Nordic's PCOH

premium paid for extended coverage of tort claims by third

parties against Nordic, not of breach of contract claims brought

by parties arguing that Nordic provided them with defective work.

Thus, the Insurers say, if part of a building that Nordic had

constructed fell off and hit a passerby or damaged a car parked

nearby, PCOH provisions would provide coverage to Nordic.

This is consistent with the Hawaii Supreme Court's

analysis in Sturla, Inc. v. Fireman's Fund Insurance Co., 67 Haw.

203, 684 P.2d 960 (1984).  Sturla was a carpet manufacturer that

was sued for having allegedly delivered defective carpet.  Sturla

sought coverage under a CGL policy that included an exclusion

providing that coverage did not apply to "liability assumed by an

24

insured under any contract or agreement except an incidental

contract."  There was a "proviso" or exception to that exclusion:

the exclusion did not apply to "a warranty of fitness or quality

of the named insured's products."  Id. at 209, 684 P.2d at 964.

Citing the New Jersey Supreme Court's decision in Weedo, the

Hawaii Supreme Court noted that the policy afforded coverage for

damage *caused* by faulty workmanship, not for damage to the faulty

work itself.  Id., 684 P.2d at 964.

        The Insurers argue that injury or damage to third

persons, not to any party to a contract with the insured, is

covered as an "occurrence."  In short, the PCOH provisions apply

to "tort liability for physical damages to others and not for

contractual liability of the insured for economic loss because

the product or completed work is not that for which the damaged

person bargained."  Roger C. Henderson, Insurance Protection for

Products Liability and Completed Operations–What Every Lawyer

Should Know, 50 Neb. L. Rev. 415, 441 (1971)(quoted in J.Z.G.

Resources, Inc. v. King, 987 F.2d 98, 103 (2d Cir. 1993)).  See

also Transp. Ins. Co. v. AARK Constr. Corp., Ltd., 526 F. Supp.

2d. 350, 356-58 (E.D.N.Y. 2007) ("The products hazard and

completed operations provisions are not intended to cover damage

to the insured's products or work project out of which an

accident arises.").

Nordic says that PCOH coverage remains illusory because injury or damage to third persons is covered even without PCOH coverage. Faced with the same argument, the Missouri Court of Appeals said in <u>Davis</u>, "[W]e read the 'products-completed operations hazard' as describing a coverage within the CGL Form for the same types of injuries or damages covered by the rest of the CGL policy but *for a different period or time or location*." 6 S.W.3d at 425 (emphasis in original).

<u>Davis</u> does not detail what different periods, times, and locations are covered by PCOH provisions, as opposed to non-PCOH provisions. The Insurers offer a chart in their Reply Memorandum that posits that, absent PCOH coverage, the CGL Policy covers only what the Insurers call "premises claims." The Insurers do not define "premises claims," but they appear to be using that term to mean claims arising while Nordic's employees are actively engaged on the work site. According to the Insurers, absent PCOH coverage, once Nordic completes its work, Nordic is not covered for accidents that its work may cause during the policy period.

The Insurers' position is supported by the very definition of "PCOH." PCOH does not include "[w]ork that has not yet been completed or abandoned." CGL Policy at 35 of 64. <u>See</u> Umbrella Policy at 26 of 63. In other words, ongoing operations

fall into the "non-PCOH" category.  Absent PCOH provisions, only non-PCOH matters are covered.

The court notes that the Policies contain other language, not cited by the parties, suggesting that accidents occurring during the policy period but after the insured completes its work are not covered in the absence of payment of a PCOH premium:

(i) The "Absolute Wrap-Up Exclusion," which no party argues is applicable to the present case, refers to damage "arising out of either your ongoing operations or operations included within the 'products-completed operations hazard.'"  CGL Policy at 14 of 64.  This language suggests that "ongoing operations" fall into the non-PCOH category.

(ii)  The Endorsement outlining the "Designated Construction Projects General Aggregate Limit" refers in Section A to the limit of insurance proceeds that will be paid for occurrences "which can be attributed only to ongoing operations." That limit is "[t]he Designated Construction Project General Aggregate Limit . . . for the sum of all damages under COVERAGE A, except damages because of 'bodily injury' or 'property damage,' included in the 'products-completed operations hazard.'" Section B of the same Endorsement examines what will be paid for damages caused by "'occurrences' . . . which cannot be attributed

only to ongoing operations."  Payment for such damages may affect the amount available under the PCOH aggregate limit.  Thus, this Endorsement also distinguishes between PCOH coverage and coverage for ongoing operations.[3]

In contending that the non-PCOH coverage continues throughout the one-year policy period even if Nordic completes its work before the end of that period, Nordic makes an argument that runs afoul of the distinction between PCOH and non-PCOH coverage.  On the topic of whether, absent payment of the PCOH premium, an insured is covered for damages caused by an occurrence only during ongoing operations that take place within the policy period, it is the Insurers' argument that is

---

[3] This is an "occurrence" policy, so no party is arguing that the claims would have to be made during the policy period.  The requirement is rather that damage be caused by an "occurrence" during the policy period, even if not detected within that period.  That was what the Hawaii Supreme Court held in <u>Sentinel</u>, which involved a dispute between insurers that, having issued their respective policies at different times, disagreed about when property damage could be said to have occurred.  The insured was being sued in connection with alleged design or construction defects, but the Hawaii Supreme Court's opinion does not suggest that the issue of whether there had even been an "occurrence" was raised on appeal.  Instead, the court addressed, among other things, how to determine the time of an occurrence.  The court concluded that the injury-in-fact trigger applied to all standard CGL policies.  "Under this trigger, an injury occurs whether detectable or not; in other words, an injury need not manifest itself during the policy period, as long as its existence during that period can be proven in retrospect."  76 Haw. at 298, 875 P.2d at 915.

consistent with the language in the Policies.  Ongoing operations may or may not extend throughout the policy period.  If they do extend throughout the policy period, then damages caused by occurrences throughout the period may give rise to coverage.

Even if Nordic is correct that the CGL Policy and Umbrella Policy are not limited to covering ongoing operations in the absence of PCOH coverage, that does not make the PCOH provisions illusory.

As the Insurers point out, the exceptions to exclusions are not rendered completely meaningless as a result of this court's determination that the Safeway and Moanalua claims do not involve "property damage" caused by an "occurrence."  This court's construction of the Policies, while consistent with the Ninth Circuit's decision in Burlington and with the Hawaii Intermediate Court of Appeals' decision in Group Builders, is by no means a universal construction.  Group Builders recognized that some jurisdictions construe "occurrence" as including defective performance of contractual obligations.  Thus, if Nordic performed work outside of Hawaii, and if the jurisdiction in which that other work was performed took a different view of the term "occurrence," those provisions could ensure that any allegedly defective contractual performance by Nordic was not excluded from coverage.  The CGL Policy is not limited to

29

covering work performed in Hawaii.  Instead, it defines the "coverage territory" as including "[t]he United States of America (including its territories and possessions), Puerto Rico and Canada." CGL Policy at 33 of 64.

Nordic stresses that Nordic does not do work outside of Hawaii, and that the Insurers had no reason to expect Nordic to perform work elsewhere.  But even an extremely limited benefit is enough to prevent a provision from being illusory.  In <u>Tri-S Corp. v. Western World Insurance Co.</u>, 110 Haw. 474, 135 P.3d 82 (2006), the Hawaii Supreme Court addressed an insured's argument that a particular interpretation of a policy made the policy an illusory contract.  The court, noting that the policy would indeed still  provide coverage for some matters, said:

> While the scope of coverage afforded Tri-S under the employer's liability portion of the policy appears to be limited at best, it is nevertheless more than illusory.  <u>See Lakota v. Westfield Ins. Co.</u>, 132 Ohio App. 3d 138, 724 N.E.2d 815, 818 (1998)(considering the same worker's compensation/employer's liability policy at issue here and rejecting the illusory contract argument because the policy was only virtually, and not completely, worthless).

<u>Id.</u> at 504, 135 P.2d at 113.

The Ohio case cited by the Hawaii Supreme Court, <u>Lakota v. Westfield Ins. Co.</u>, 132 Ohio App. 3d 138, 724 N.E.2d 815, 818 (1998), included a footnote stating, "It should not be a surprise

30

that the benefit might be modest in light of the fact that the total annual cost of the coverage was only $250." Id. at 143 n.5, 724 N.E.2d at 818 n.5.  Notably, while recognizing that a proportional cost for little coverage makes business sense, the Ohio court does not suggest that a disproportion between a benefit and the cost of coverage would render illusory a contract that, but for the disparity, would not be illusory.  The Hawaii Supreme Court is equally silent in that regard, and it is difficult for this court to see any logic in allowing the amount of a premium to convert a nonillusory provision into an illusory one.[4]  Even if the chance that Nordic would perform work outside of Hawaii is minute, the coverage that might be provided is not illusory.

In any event, in declining to deem the PCOH provisions illusory, this court is not relying solely on the possibility that Nordic might perform work outside of Hawaii.  Assuming covered PCOH damages are distinguishable from covered non-PCOH damages (a matter Nordic says is true only if the PCOH provisions give rise to coverage for defective contractual performance), Nordic's payment of the PCOH premium increased the total dollar amount of coverage available to Nordic.  As stated in Section

---

[4] In fact, even if Nordic stayed in Hawaii, the exceptions to exclusions would have considerable value if the Hawaii Supreme Court were to agree with Nordic's view of the term "occurrence."

31

III, "Limits of Coverage," of the CGL Policy, the General Aggregate Limit, listed in the Declarations page as $2,000,000, is the most that will be paid for the sum of medical expenses under Coverage C, damages under Coverage B, and damages under Coverage A, "except damages because of 'bodily injury' or 'property damage' included in the 'products-completed operations hazard.'"  There is a separate PCOH Aggregate Limit of $2,000,000 that is the most that will be paid "under Coverage A for damages because of 'bodily injury' and 'property damage' included in the 'products-completed operations hazard.'"  CGL Policy at 31 of 64. Thus, if Nordic had had to pay third parties in connection with tort claims involving both PCOH damages and non-PCOH damages, Nordic would have had both aggregate limits available.

This court concludes that no illusory contract provision is "created" by this court's "occurrence" analysis. Nor does that analysis make any provision ambiguous such that construction in favor of the insured is required.  Every PCOH provision has some meaning, even if the resulting coverage is extremely limited.  That is, Nordic is incorrect in arguing that the only Policy construction that avoids nullifying the exceptions to exclusions is the construction that reads those exceptions as expanding coverage to include coverage for defective performance of contractual obligations.  Not only would

32

Nordic's proposed construction serve to increase coverage based on provisions designed only to avoid a decrease in coverage, it would ignore the proposition set forth in <u>Tri-S</u> that even substantial limits on coverage do not render a contract illusory. On the basis of the analysis above and the analysis in the Prior Dismissal Order, this court dismisses Count I.

### B.  Count II (Negligent Misrepresentations and Omissions) Is Dismissed.

Count II bears the title, "Negligent Misrepresentations and Omissions of Material Fact."  It is a slightly modified version of what was Count III in the original Counterclaim, "Misrepresentations And Omissions of Material Fact."  <u>See</u> Document Indicating Changes Between Nordic's Counterclaim and Nordic's First Amended Counterclaim at 31-32, ECF No. 85.  The court earlier dismissed Count III of the original Counterclaim as "insufficiently pled" and detailed the shortcomings of the claim. <u>See</u> Prior Dismissal Order at 38-43.  While the present Count II attempts to address some of the court's concerns, the claim remains inadequately pled.

Count II alleges, "As specifically detailed above and as further discovery will reveal, the Insurers purposely or negligently made material misrepresentations and failed to disclose material information in connection with the policies."

Am. Countercl. ¶ 83, ECF No. 85. The Insurers also allegedly "[m]isrepresented the coverage afforded under the Policies" and "[f]ailed to disclose any intention by the Insurers that the Policies would not cover post-completion property damage claims or claims arising out of construction defects, or the alleged grounds that they do not arise out of an 'occurrence,' as defined by the Policies." Am. Countercl. ¶ 84. Finally, Nordic claims that the Insurers "knew, or should have known, that their representations were false at the time they were made," that "Nordic reasonably relied upon such material misrepresentations and omissions of facts by the Insurers," and that "Nordic has suffered, and continues to suffer, substantial damages" as a result. Id. ¶¶ 85-87.

The court continues to be concerned that fraud is being alleged without compliance with Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that, when fraud or mistake is alleged, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. 9(b). As noted in the Prior Dismissal Order, to adequately identify the circumstances that allegedly constitute fraud, a plaintiff must identify "the who, what, when, where and how" of the alleged fraud. Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997) (internal quotation marks omitted). Failure to satisfy Rule

34

9(b)'s requirements subjects a pleading to dismissal.  <u>See</u> <u>Vess</u> <u>v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1107-08 (9th Cir. 2003).

Count II alleges that the Insurers "purposely" misrepresented and omitted material facts.  Am. Countercl. ¶ 83, ECF No. 84.  Because the court is uncertain as to how a purposeful misrepresentation could be negligent, it appears to the court that Nordic is attempting to plead a fraud claim.  To the extent the purposeful misrepresentations and omissions are alleged to be in the nature of fraud, they are alleged without specificity as to "the who, what, when, where, and how" required by Rule 9(b).  <u>See</u> <u>Cooper</u>, 137 F.3d at 627.  The only matter that Nordic articulates with any particularity concerns an omission. That is, Nordic asserts that the Insurers "[f]ailed to disclose any intention . . . [to] not cover post-completion property damage claims or claims arising out of construction defects, or the alleged grounds that they do not arise out of an 'occurrence,' as defined in the Policies."  <u>See</u> Am. Countercl. ¶ 84, ECF No. 84.  The problem with this allegation is that it assumes that an insurer must communicate in advance what is not covered and why, when the policy itself cannot be said to be misleading in that regard.  Nordic does not assert that any Policy language was concealed or altered.  Nor does Nordic articulate the facts evidencing any fraudulent intent behind the

alleged omission.   Under these circumstances, Nordic does not sufficiently plead fraud.

That leaves the negligent misrepresentation claim Nordic purports to be asserting.   It is impossible to determine what misrepresentations and omissions were not allegedly purposeful, such that they could be said to make up the bases of the negligent misrepresentation claim.   The intertwining of purposeful and negligent claims is compounded by Nordic's reassertion of "the allegations contained in all of the foregoing paragraphs as if fully set forth herein."   Am. Countercl. ¶ 82, ECF No. 84.   This makes it difficult to identify precisely what is encompassed by Count II.

To the extent Count II alleges negligent misrepresentation, those allegations are subject to Rule 8 of the Federal Rules of Civil Procedure.   See Peace Software, Inc. v. Hawaiian Elec. Co., Inc., Civ. No. 09-00408 SOM-LEK, 2009 WL 3923350, at *6 (D. Haw. Nov. 17, 2009); Bush v. Rewald, 619 F. Supp. 585, 608 (D. Haw. 1985).   In Hawaii, a negligent misrepresentation claim requires: "(1) false information be supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information is supplied suffered the loss; and (3) the recipient relies upon the misrepresentation."   Blair

36

v. Inq, 95 Haw. 247, 269, 21 P.3d 452, 474 (2001) (citing Restatement (Second) of Torts § 552).

Nordic does not clearly identify what false information was supplied.  Nordic appears to be complaining that the Insurers should have laid out for their insureds matters of law, and that the failure to communicate something equivalent to this court's rulings on the "occurrence" issue makes the Insurers liable for misrepresentation.  That is not the law of negligent misrepresentation.

Nor does Nordic hint at what loss it suffered.  Is Nordic saying that other insurance that did cover defective contractual performance was available and, but for the Insurers' alleged misrepresentations, Nordic would have purchased such insurance?  Or is Nordic saying that, not having told Nordic that defective contractual performance was not covered, the Insurers must cover defective contractual performance even if not required by the Policies?

The court's dissatisfaction with the misrepresentation claim may be rooted in the fact that the claim was drafted while Nordic was still asserting a contract claim.  The dismissal of the contract claim sufficiently alters the landscape of this case that it may make sense for Nordic to replead the misrepresentation claim in light of that dismissal.

## C.   Count III (Bad Faith and Fraud) is Dismissed.

Count III bears the title "Bad Faith and Fraud."  The original Counterclaim included a bad faith claim that appears to have been based on both allegedly fraudulent activity and activity that did not constitute fraud.  In the Prior Dismissed Order, this court dismissed the portion of the bad faith claim based on fraud, given the lack of specificity in the allegations.  The remainder of the bad faith claim remained, given the court's recognition that Hawaii law did not limit bad faith to situations involving fraud.  See Best Place, Inc. v. Penn America Ins. Co., 82 Haw. 120, 133, 920 P.2d 334, 347 (1996).  Count III of the Amended Counterclaim is an attempt to revive the fraud claim.  It is, however, not a successful attempt.

First, both the fraud and nonfraud portions of Count III are based in part on the premise that the Policies do indeed provide coverage of the Safeway and Moanalua disputes, and that the Insurers are denying coverage in bad faith.  This portion of Count III fails, given the court's disposition of the coverage issues.  "[C]onduct based on an interpretation of the insurance contract that is reasonable does not constitute bad faith."  Id., 920 P.2d at 347.  Even without the court's rulings, "an erroneous decision not to pay a claim for benefits due under a policy does

not by itself justify an award of compensatory damages." Id., 920 P.2d at 347.

Second, to the extent Count III asserts that Nordic was charged premiums but is receiving nothing in return, this claim is also foreclosed by this court's coverage rulings.

Third, to the extent any part of Count III complains about the premiums charged by the Insurers, it is not accompanied by any allegation that the premium amount was concealed or misrepresented.  Nordic instead is complaining about the manner in which the Insurers calculated the premiums.  Yet, in opposing the Insurers' motion to dismiss, Nordic advances no law indicating that a bad faith claim may be premised on the manner in which a premium is calculated.  If a premium were plucked out of thin air, that might be a bad business practice that could not be sustained in the face of competition, but the court is hard-pressed to see how, without more, that is bad faith if the premium amount is clearly communicated to an insured who is free to shop among competing insurers.  Nothing in Count III indicates that Nordic was compelled to purchase anything from Insurers.

Taking the preceding points into consideration, the court concludes that the fraud portion of Count III remains unclear.  Nordic appears to be complaining about a matter of law rather than about a factual misrepresentation.  No actual

specific misstatement is detailed.  The reasons the court dismissed the fraud claim in the original Counterclaim are wholly applicable to the present fraud claim.  The court is not saying that Nordic can or cannot make out a fraud claim.  The court is instead saying that Nordic has not pled a viable fraud claim given the court's rulings.

Turning to the nonfraud portion of Count III, the court, having allowed the earlier nonfraud bad faith claim to stand, cannot help concluding now that, notwithstanding Nordic's augmentation of Count III, new developments make those allegations insufficient.  The first new development is this court's disposition of all of Nordic's coverage claims.  In the Prior Dismissal Order, the court anticipated that PCOH coverage claims would be asserted.  It was therefore to be expected that any new bad faith claim that might be asserted would include the premise that coverage was owed to Nordic.  Now that Nordic has no coverage claim, any bad faith claim should be free of the assumption of coverage.  Fresh bad faith allegations would enable the Insurers to tell what remains of Nordic's bad faith claim. The present bad faith claim is so inextricably intertwined with the assumption that there is coverage that it is difficult to determine what really remains in issue.

40

The second new development is Nordic's inability to satisfactorily respond to the court's direct inquiry about what bad faith, separated from any coverage issue, was being claimed. This was not an inquiry that was sprung on Nordic.  This court, in its prehearing Inclinations, asked Nordic to be prepared at the hearing on the present motion "to point to specific words in Count III manifesting" any bad faith claim that was not based on coverage.  The court also said:

> If Nordic is asserting a bad faith breach of the duty to defend, the court notes that there is a one-line reference to the duty to retain competent defense counsel for Nordic, but no allegation at all that that particular duty was breached.  At most, Nordic accuses the insurers of having failed to reimburse Nordic for the cost of supplementing the defense provided by appointed defense counsel.  The court is inclined to say that Nordic's conclusory assertion that this refusal was in bad faith is unaccompanied by specific factual allegations going to bad faith.

ECF No. 116 at 3.

In providing Nordic with notice of the information it wanted, this court was conscious that Hawaii law permits a bad faith claim even in the absence of an entitlement to coverage. Enoka v. AIG Hawaii Insurance Co., Ltd., 109 Haw. 537, 128 P.3d 850 (2006), held that an insured may sue an insurer for bad faith mishandling of the insured's claim even if the insurer is not

obligated to pay the insured any benefits.  Similarly, in <u>Miller</u> <u>v. Hartford Life Insurance Co.</u>, 126 Haw. 165, 176, 268 P.3d 418, 429 (2011), the Hawaii Supreme Court said its decisions on the bad faith issue were designed "to provide the insured with a vehicle for compensation for all damages incurred as a result of the insurer's misconduct, including damages for emotional distress, without imposing a threshold requirement of economic or physical loss."  This court was therefore searching for an articulation by Nordic of a bad faith claim separable from its coverage claim.

At the hearing, in response to questions from the court about what bad faith claim could be separated from the coverage claim (including, for example, a question about whether Nordic was seeking reimbursement of the PCOH premium), Nordic conceded that the heart of its claims went to this court's "occurrence" analysis.  This concession makes it all the more important that the bad faith claim be clarified.

Unable itself to determine what remains of the bad faith claim absent the coverage claim, this court dismisses Count III in its entirety.

### D.   Count IV (Declaratory Relief) Is Dismissed.

The court similarly dismisses Count IV (Declaratory Relief).  Count IV appears to be premised on the existence of

coverage and to be seeking a declaration that the Insurers are
obligated to provide a defense and indemnification.  To that
extent, it duplicates the contract claim, which this court
dismisses.

The court notes, however, that, notwithstanding the
reference to "declaratory relief" in the heading of Count IV, the
count includes allegations that do not appear to lend themselves
to declaratory relief.  Paragraph 105 of the First Amended
Counterclaim states:

> Based on their conduct in calculating and
> accepting the premiums for the Policies,
> failing to properly reserve their rights to
> deny coverage, and tendering the Safeway
> claim for alleged roof deck defects to
> Cascade and its general liability insurance
> carrier under the same theory advanced by
> Nordic, the Insurers should be estopped from
> disclaiming PCOH coverage.

To the extent Count IV seeks an order estopping the Insurers from
disclaiming PCOH coverage, Count IV is dismissed.  Nordic
provides no law supporting such a request.

Moreover, the First Amended Counterclaim does not
allege that the premium amount was concealed from Nordic.  Nordic
cites no law requiring disclosure to an insured of an insurer's
manner of calculating a premium.  Nor does the court see any
basis for estoppel in the Insurers' reservation of rights.
Nordic's claim that the Insurers failed to properly reserve their

rights is not a factual allegation; it is a conclusion.  When the court examines the description in the Amended Counterclaim of the reservation, no impropriety is apparent.

While Nordic notes that, in referring to possible preclusion of coverage, the Insurers did not expressly address PCOH coverage, this court rules that PCOH coverage is part of Coverage A and thus subject to the same "occurrence" requirement as non-PCOH coverage.  Count IV includes no facts suggesting a need for the Insurers to make separate reference to PCOH coverage.

Finally, in opposing the Insurers' motion, Nordic cites no law penalizing an insurer for tendering a claim to another party and its insurer while simultaneously reserving the right to deny coverage.  The Insurers cannot be faulted for taking precautions.  Indeed, they have filed the present lawsuit as a precaution, even while providing a defense.  Until this court ruled, they could not be assured that no coverage would be found.

Count IV is now dismissed.

## V.        CONCLUSION.

The court GRANTS the Insurers' Motion to Dismiss Nordic's Amended Counterclaim.  However, the court extends the cutoff for motions for leave to amend pleadings.  The court sets the cutoff at November 21, 2012.  Nordic may move before the

Magistrate Judge for leave to file a Second Amended Counterclaim
that is consistent with the present order.  That is, the court is
not giving Nordic leave to file a Second Amended Counterclaim; at
most, Nordic may move for leave.  Any motion must include the
proposed Second Amended Counterclaim as an exhibit.  Nordic may
not include claims that are irreconcilable with the rulings
already issued in this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 31, 2012.



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

Illinois National Insurance Company et al. v. Nordic PLC
Construction, Inc. f/k/a Nordic Construction, Ltd., Civ. No. 11-
00515 SOM/KSC; ORDER GRANTING COUNTERCLAIM DEFENDANTS' MOTION TO
DISMISS COUNTERCLAIM PLAINTIFF'S FIRST AMENDED COUNTERCLAIM.